Good afternoon, everybody. Thank you for your forbearance. It looks like we have resolved all the technical issues. We are conducting this conference from the courthouse in San Francisco and I have on video connection the appellant, Ronald Gerard Boyajian, appearing from the U.S. Penitentiary in Tucson, Arizona. And let me take an appearance from the government first, please. Vanessa Bear Jones Good afternoon. This is Vanessa Bear Jones for the United States and with me is AUSA Alana Hartson. Ronald Gerard Boyajian Okay, thank you. And do we have on the line stand-by counsel, George Buehler? George Buehler Good afternoon. Yes, you do. Ronald Gerard Boyajian All right. And I see in front of me on the screen the appellant, Mr. Boyajian, correct? George Buehler Yes, I'd like to speak before we proceed. Ronald Gerard Boyajian I'll give you an opportunity to do that once I get all the preliminaries out of the way. George Buehler Thank you, sir. Ronald Gerard Boyajian Okay. And then do we also have on the line legal counsel from the Federal Correctional Facility in Tucson? Vanessa Bear Jones No, she won't be, Ronald. We have counsel sitting here. Ronald Gerard Boyajian All right. Is there anybody else on this connection line who has not yet identified themselves? All right. With me in San Francisco is my law clerk, Marty Llewellyn, and my courtroom deputy and judicial assistant, Juanita Alvarez. And this hearing is a hearing based on the request by the appellant, Mr. Boyajian, that the court exercise its discretion to allow Mr. Boyajian to represent himself in this appeal. And before I give you the stage, Mr. Boyajian, I just wanted to let everybody know that this proceeding is being recorded, so in the event there is a necessity to have a record of it, one is available. And before we proceed further, Mr. Boyajian, I'd like to swear you in before you make any statement so that you understand that everything you say will be under penalty of perjury. And so I'll ask my courtroom deputy to administer the oath. Juanita Alvarez Would you please raise your right hand? Do you solemnly affirm that the statements you are about to make in the case filed before this court will be the truth, the whole truth and nothing but the truth, and this you do under the pains and penalties of perjury? Yes, I do. Thank you. All right. Mr. Boyajian, do you have any physical or mental impairments that would affect your ability to participate fully and knowingly in the proceedings today? No, I do not have any physical or mental impairments that I'm aware of. All right. Are you able to hear me and to respond freely? Yes. Yes, Mr. Commissioner, I'm able to hear you and respond clearly. All right. So before I begin with my remarks and comments and the colloquy, you've requested an opportunity to make an introductory statement, and I will grant that request, so I will give you an opportunity to say something now. But I do want to let you know that during the course of this hearing, I'm going to be asking you a lot of questions and giving you an opportunity to explain things. So you don't need to go through everything. If you have a preliminary comment that you want to make, I'll give you a short leash to do so. Okay. Mr. Commissioner, I just received notice here of Mr. Bueller's participation here, and this is of concern to me. So I haven't had the opportunity to brief it, and I'd be very happy if I have that opportunity. Mr. Commissioner, going forward with both the government and conflicted former standby counsel puts me, the appellant, in a situation that I can't discuss case management issues, and I respectfully ask that you set a schedule for me to brief it. As I set forth in docket number 10 of the appellant record, there were significant problems with the involvement of Mr. Bueller at my trial. I don't want to weigh these issues by participating here without making my record. I know, Mr. Commissioner, typically you do this with other cases and the standby counsel's presence in government. But what distinguishes my case from other cases is the Fifth and Sixth Amendment issues pertaining to him, and as such, this forum is inappropriate for Mr. George Bueller's participation. Further, I do have to oppose Mr. Bueller to speak about any    do not expire. I'm not permitted to violate his confidentiality. And so what I would hope for, Mr. Commissioner, is I'd ask respectfully if you would set a briefing schedule, say four weeks for me to point out the conflicts and the Fifth and Sixth Amendment issues that make his involvement a problem, and then we could continue this discussion in six weeks, continue and have this hearing where, Mr. Commissioner, if you choose to have him present, at least I would have made my record, or in the alternative, Mr. Commissioner, if you choose to have a conflict-free representative in his stead. Thank you. All right. Mr. Bueller, could you describe for me your involvement as standby counsel in the proceedings below, without violating any confidentiality? Yes. My involvement was to have been appointed by Judge Snyder in December of 2015, I believe it was. And I attended the trial, and I had various conferences and interactions with Mr. Boyajian during the pretrial, by which I mean the trial preparation and so forth. And I did not conduct the trial at Judge Snyder's direction. I was present every day to lend what assistance I could or advise to Mr. Boyajian. And it need be to assume the conduct of the trial. It's for some reason that it arose that Mr. Boyajian preferred it. And so I think that generally describes my role. All right. And did you provide a significant amount of advice to him during the course of the trial? Yes. Yes. All right. Did you discuss with him the question of self-representation on appeal? No. I have not discussed it. I don't believe I've discussed that with him, no. Okay. And I do believe it was, I think it was clear that he, well, I don't remember if we discussed it, but I think I was well under the impression that he would not want my assistance on appeal. And do you have any position on whether the court should grant or deny him leave to represent himself on appeal? No, I do not have a position. Do you have any comments or remarks that you think would be helpful to the court in reaching its determination at this hearing? No, I don't think so. Do you have, is there any reason that you see for your continued participation in this proceeding? No. All right. So in light of your request, Mr. Boyajian, and in light of the fact that it appears that Mr. Buhler has no meaningful input to this proceeding, I'm going to excuse Mr. Buhler from further participation so we can continue this proceeding without Mr. Buhler. And in so doing, I think that the question of proceeding with conflicted counsel will be mooted. So I will not consider anything, I have nothing from Mr. Buhler, I will not consider anything from Mr. Buhler, and I will only consider matters that I hear from you, Mr. Boyajian, and from the government as we go forward in this hearing. Does the government have any position on excusing Mr. Buhler from further participation in this proceeding? No, the government takes no position on that. All right. Mr. Boyajian, do you have any opposition to me excusing Mr. Buhler from further participation in this hearing? No opposition for excusing Mr. Buhler, no. All right. Yes, did you? I'm happy with his being excused, correct. All right, all right. Mr. Buhler, thank you very much for taking the time to appear today and to participate, and I'm going to excuse you and conduct the hearing without your continued presence. Thank you very much. Thank you. All right, we have gotten the confirmation that Mr. Buhler has left the conference. We'll proceed now with the self-representation hearing. Mr. Boyajian, in response to your request to represent yourself on this appeal, the court has authorized me to conduct this hearing to make sure that you understand the dangers and disadvantages of self-representation on appeal and that your request is knowing, intelligent, and unequivocal. Do you understand? I understand, Mr. Commissioner. And I am very well aware that you participated in a self-representation proceeding in the district court under the Feretti case, and I'm going now to conduct a similar inquiry for purposes of the appellate proceedings. You have the right to counsel on appeal. If you cannot afford to retain counsel, you are entitled to have counsel appointed to represent you at government expense. The court also has discretion to allow you to represent yourself. If your request is knowing, intelligent, and unequivocal, and is not intended to delay the proceedings on appeal. In determining whether the court will allow you to represent yourself, the court will inform you of the dangers and disadvantages of self-representation on appeal, and will inquire whether the issues on appeal are so complex that the assistance of counsel would aid the court in deciding the case, and inquire whether granting self-representation could unduly burden the court or undermine the integrity of the outcome. Do you understand all that? Yes, Mr. Commissioner. I understand that. Good. And as I, I don't know whether I've already mentioned this, but you do not have a right to counsel on appeal, as you did under the trial court. Yes, I understand. All right. You may withdraw your request to represent yourself, and in that event you may retain counsel who will enter an appearance. I am also authorized to appoint counsel to represent you if you are financially eligible. The court of appeals does not, however, permit the appointment of advisory or standby counsel, and I say that knowing that you are not particularly interested in that outcome anyway, but you can't represent yourself and simultaneously have counsel represent you. Do you understand all that? Yes, I understand. All right. So I'd like to delve a little bit more into your background in detail, and I did see in your response, on request for self-representation, that you provided some information about your background, your education, job history, and writing experience, and I just wanted to get a more complete resume from you. So I understand that you, in 1982, you graduated with a Bachelor of Science degree in physics from the University of California, Los Angeles. Is that correct? Yes, Your Honor, correct physics. And then after you graduated in 1982, what did you do? I was in my master's physics program, and I was fortunate enough to be entered into the United States Navy in the aviation officer candidate program in Pensacola, Florida. It's for a naval aviator training program. So I'm not sure I understood you. Did you say you had begun a master's program, and simultaneously were doing the naval aviator program? No. I was starting my master's work. I was taking master's courses in physics at UCLA, and I finally received my acceptance from the naval aviator program in Pensacola, Florida, and thereupon I left, departed UCLA, and went to Pensacola, Florida to begin training in the aviation officer candidate school for that program. And did you graduate from that program? I think my, beyond that, I think it's classified. We should just say I had an honorable discharge some period afterwards. You were in the Navy from 1982 until a certain date? Approximate, 84. 82 to 84? Yes. And then I had an honorable discharge, and I had a secret clearance, so I can't discuss anything or what I trained or what I did. Okay. After your discharge in 1984, what did you do? About that time, I returned to California, and I was offered a job at Lytton Guidance and Control in Woodland Hills, and I had a top-secret clearance, and I can't, working various Department of Defense projects, and I cannot discuss any of that or what happened. How long were you employed by Lytton? I think it was approximately two years. And what was your next employment? I was offered a job by Hughes Aircraft, and I interviewed, and they gave me a position as a research physicist. My position at Lytton was, I guess, a more or less introductory position, but I was still a physicist, but I didn't have that title. They gave me the full physicist, scientist title, and I was in charge of a lot of stuff, also top-secret space-based weapons systems, and I continued that work for a couple years until the program went black, completely black. And at that point, we were at, the work I did, I was at, I had to now essentially disengage from my life and everything black location, or I can continue and maybe find a different job in Hughes. So, to continue with my program, I respectfully declined to go into the black, in other words, you report to work in black location. You don't exist. And I couldn't live like that, so I asked to maybe find some other work at Hughes, and the rest of the program disappeared, because once Russia was no longer a concern to us, the program went, only the black continued. All the rest of the stuff was vaporized. So the downturn in our Department of Defense contract, and so then at that point, I left Hughes Aircraft and started to work for myself. And that was approximately 1988? Correct. And... I don't have my date. Let's just put down, what date do I have here? In many years. So... It was about 1988, 1989, around there. So, and then I see there's a blank here in your description between 88 and 96. Okay. In 1990, I suffered a statutory rape conviction. My living girlfriend was 16, and I had to go to jail for that. It's unlawful in California, it's unlawful for consensual sex with 16-year-olds, and even though we were, well, even though we were together with family consent, engaged, whatever, it turned into a... It was illegal under California, and I needed to suffer the consequences of that, and I did. I was actually jailed for that. I did time, and I wasn't released from incarceration until about, I think, 1996, I think. So it was... Okay. Between 88 and 90, you said you worked for yourself. What kind of work was that? I was doing consulting with various engineers in the kind of work I did, number one. So I maintained contact with different engineers and was paid privately to do some of the physics in their calculations. Also, I did private tutoring. I offered my assistance, and I put my name into the UCLA tutoring list, and I had students, undergraduates, and graduates who asked me to provide them tutoring help. At that time, I only assisted in physics, chemistry, math, pretty much solid sciences at that time. That's 88 to 90? That's 88 to 90? Yeah, until I was incarcerated, I think it was like... I think I was actually incarcerated in, like, 93. When I give dates here, it's been so many years, and I'm doing this spontaneously. I was incarcerated, I believe, 93 to 96, thereabouts. And until my incarceration of, let's say, 93, I was doing the same work that we just talked about, the consulting and tutoring. And then you were released from custody in 96, and then from 96 to 2009, you say you were a consultant? Yeah. 96 to 2009, yeah. Yes? Yes. When I was out of incarceration, I was on parole for some period of time. I'm not sure. I think it might have been two or three years. But also, many work options, pretty much my work options were unavailable, especially with my background. So what I did was I offered my services at the universities in Northern California, mostly at the time, Berkeley, Stanford, other universities. And I had students who were undergraduates and graduates. But now I didn't limit myself to sciences. Now I help them in any course that was offered at the university. And also, when I offered the students and they started graduating, then I would continue to work with them when they were in graduate school, let's say, even if it was in another country. So I ended up having students abroad, in England. I had students in Taiwan. I had students in Russia. I had students just all over the world. By about 2000, 2009, I had undergraduates and graduates who were my clientele. And it was in very many disciplines. On top of that, I consulted with engineers on the defense things. But this was more private and private. It wasn't for the U.S. government or anything. But your primary living was made as a tutor during this period of time for students at the graduate and undergraduate level? I would say the majority of the work would be tutoring, consulting. And also, this included... Well, we'll leave it at that. And then 2009, after 2009, was when you got involved with this current proceeding, correct? Yes, I was arrested in Phnom Penh, Cambodia in February, I believe, 19th of 2009. I was placed in a detention, in a prison over there. And then I was eventually renditioned to the United States. The second year, and I've been... So February 2009 was when they placed me in prison abroad. And in the middle of the year, about August or September, I was renditioned to the United States. And I was in NBC, Los Angeles, all the way up until just a few months ago. So, and why is it that you want to represent yourself in this, in the Court of Appeals, when you could have an attorney, an experienced appellate attorney, represent you, somebody who's familiar with appellate practice and procedure? Sure. I don't really want to boast too much, but maybe I'm in a position from that question. About three years ago, I submitted a brief to the Public Defender's Office in 2013. I informed them about various legal issues pertaining to the Michael Pepe case. And I said, this case can impact me. I have the same charges. I wrote a brief that included how foreign residency was a problem in the law, and that a new law had come into effect, and that the new law was now charging foreign residents. The old law that Pepe and I and others were under did not. And I said, I have the Senate reports. And I had the Senate reports. And they didn't know about this, nor did any other lawyer know about what I'm talking about. So I briefed it. I briefed the residency issue. I briefed how the Clark decision was impaired because they violated the United States Supreme Court ruling in REICH, R-A-I-C-H, REICH. That ruling required a substantial impact test on foreign commerce, and it wasn't conducted in Clark. I set out case law, and I set out, basically, this is stuff that the landmark case for which I'm here for, and Mr. Pepe and many others, that there were problems with the Supreme Court, with the Ninth Circuit's ruling in Clark. I also pointed out Jackson, and I pointed out the Senate reports, the Republican reports, and I showed this to the public defenders. The public defenders eventually took my issues, and they were actually argued here in the Ninth Circuit. I am the author of pretty much all the arguments that Mr. Pepe's attorney made, Mr. Laughlin, in front of the Ninth Circuit, and I prepared those three years ago. Now, when I prepared those arguments, his lawyers had no idea about any of the things I'm talking about. No other lawyer seemed to know about anything about the Clark decision or 2423. So my issues now are being de novo reviewed. I did raise these same issues in front of my district court, and again, there's no case authority. There's Clark's decision. There's no legal authority for any lawyer to review to have any idea of how to interpret the Clark decision and whether the 2423 law applies to tourists or residents or where you draw the line or the gap. The understanding of this law is something lawyers just can't do. And they don't have guidance from the Ninth Circuit because the Clark decision seemed to be more for tourists and they had a limited gap. So I went above and beyond that raising issues, and my judge, Honorable Judge Schneider, told me that these were all interesting points. She gave the words she used were very complimentary, meaning these are very good arguments and maybe new. They're de novo review arguments. So there's no case law or anything. And so all of my arguments that were raised just a few weeks ago in front of the Ninth Circuit by Mr. Laughlin, I had already raised those in front of my own judge in 2014, Honorable Judge Schneider, and other lawyers had then raised the same arguments because I shared my briefs with other people who had 2423 cases. And then subsequently you see the Mr. Pepe's appeal. This will be a landmark changing event if they rule that the law did not apply to residents because I was living for 10 years abroad when I was picked up. I was a resident of Cambodia. Now, there are other issues also that apply and constitutional challenges. Basically, there are many areas of de novo review. I'm just giving one that the entire appeal that just occurred right now, which all three judges were very, I think, moved by the issues raised by Mr. Laughlin. And I'm the author of those ideas. So let me interrupt you if you don't mind. First of all, just as a matter of nomenclature, you keep using de novo. And in the world of appellate litigation, that word typically refers to a standard of review of a ruling by a district court on appeal. And what a de novo review would mean is that the court of appeals would review a matter without giving any deference to the district court. That is, it would look at it afresh. That would be one standard of review that would be distinguished from, for example, viewing a district court's ruling on an evidentiary matter for abuse of discretion. So where the court reviews for abuse of discretion, there's a certain amount of deference given to the district court. And then there are other standards of review, like we would review a factual finding for clear error. So we would give a great deal of deference to the fact finder. You're using the word de novo, I believe, as you're saying that this is a matter of first impression. That is, it has not been decided. So as a matter of nomenclature, I'm thinking that every time you say de novo, I'm thinking, well, this is a matter of first impression. It hasn't yet been decided. So I wanted to educate you about that and make sure I understand. Correct. Yes, I'm a little nervous here. I have not met you before. Second point. OK. You're correct. So second point. I am a little bit familiar with the Pepe case for unrelated reasons. But my question to you is, is it your thinking that the issues in Pepe are so similar to the issues that you're raising about extraterritorial jurisdiction and all those other issues concerning the reach of United States criminal laws to activities that occurred overseas that you think that the decision in Pepe, one way or the other, is going to act as precedent in your case? I think you alluded earlier that you thought that the case was very much like your case. So is it your thinking that the issues in Pepe would be likely to be the same issues to a very large extent that you have in your case? I'd like to answer this without a yes or no and be boxed in. I think I have a 24-23 charge just like Mr. Pepe. And I also have the V-count charge, which the government superseded years later and added the travel with intent charge, which he doesn't, which distinguishes our cases. And I also have a 10-year enhancement for being required to register for purportedly having sexual prostitutes in Cambodia at a time where I was required to register in California, even though I wasn't in California, didn't live there or wasn't a resident of California. They added that 10 years. And he doesn't have that. So our cases are wholly distinguishable. But what I do want to say is that one of my issues, one, and I think I mentioned it here, is the implied and testamentary challenges to the law. But my challenges are much deeper. Mr. Laughlin did not raise certain issues, and I think it would require maybe an embankment because the constitutionality of the Clark ruling itself and the constitutionality of this ruling, whether foreign commerce applies or not, no substantial basis test was conducted. No empirical data was given to show that there's any effect on foreign commerce. If the treaty power is used, the necessary and proper clause to effectuate a treaty, if that is used, there are problems there which he started to introduce in his briefs. But there are other constitutional issues that have to be addressed. Now, Mr. Laughlin couldn't raise those issues in the Pesky case because he had to go in box to raise those, I believe. He didn't raise those in the oral arguments, and they weren't discussed. He kept saying that... I think there was an idea that if you want to... the judges were saying you have to go in box to raise the challenges to the constitutionality. So I have the constitutionality that I would also attack. I have other issues also. But, excuse me for a second, but you would face the same obstacle that is that there would be controlling Ninth Circuit law that was... that you believe was wrongly decided, but in order to get the Ninth Circuit to agree with you, you would have to get an on-bank panel to overrule Clark, correct? Overrule parts of Clark. The Clark decision, I'm okay partially when it comes to tourists. And when it's within the travel of actual foreign commerce. But if there's a gap, Clark basically allowed for a gap. It only set two months because that was the appellant. But it left open a wider gap. Clark didn't say that the gap was two months, and these judges said that there's going to be no gap. So my feeling is that part of Clark's ruling sort of would apply to a tourist who jumps on a plane and does bad things. I agree with that. But when it comes to residents, I think there are constitutional challenges that haven't been raised and weren't addressed with these judges. Whether it requires going in bond or not, and whether I have to go against the district court ruling for Clark and also the Mr. Peffy ruling, whatever it is, I don't know right now. But I do want to say that depending on the result in this, depending on what happens right now, for example, if they do agree that it doesn't apply to residents, then that applies to me, and I need an evidence hearing to go back and show evidence of my residency. I was showing the evidence of my residency, but the judge refused to allow me to bring witnesses and to prove my foreign residency. She said it was irrelevant. She said it was foreclosed by Clark. Clark applied to residents and tourists. If the new decision goes against and says that the Clark decision actually applies universally, and that this was only some type of amendment, or if they put some wider gap, then I think I would be faced with having to go against case law and precedent. But the constitutionality issues, I think I would have to either argue with them or try to get it unbond. Let me say this, Mr. Commissioner. Mr. Clark's decision never addressed, they used the improper standard of substantial basis test. They used a substantial rational basis test, not a substantial basis test disavowed by the Supreme Court. I haven't decided exactly how I would go against that, but it appears that they could wait. The two justices were, Mr. Ferguson raised the proper dissent in that case, saying that you're supposed to show a substantial basis to foreign commerce if you're going to raise foreign commerce law. So I do believe that one way or the other, whether I'm going against precedent and have to go unbond, or whether I'm going against precedent or whether I have to, it's going to be a first impression, I'm going to be striking at the constitutionality on different fronts. And so my answer, I can't give you an answer if the precedent is going to exactly be in front of me or not until I see the ruling in this case. But I do want to add that there are other problems with this law that I'm raising which will be a first impression also. And that is that there are many layers involved with bringing somebody from a foreign country and you don't bring as evidence or witnesses and I go to trial and I can't have witnesses or evidence to present a defense because according to my judge and the prosecutors, the constitution stops at our borders. So I don't have a right to witnesses, I don't have a right to a defense. So I go into a trial and I can't defend myself. Okay, let me cut you short because I want to make sure I cover what I need to in this hearing and I don't know what the timing is there because we've got a late start and I don't want to get you in any trouble with the prison there. I want to make sure we cover everything. I think I've got a good sense from what you've already described about your thinking about the case so I don't think you need to elaborate about that. But I did want to make a record of the colloquy that's required of the dangers and disadvantages of self-representation on appeal and I wanted also to ask the government counsel to pay attention to my recitation now because I'm going to ask you, counsel, at the end to see if there's anything else that you would add to my colloquy. So to begin, and I understand, Mr. Boyajian, that you're fairly well versed in these matters but I do want to make a record that you have been informed. So first of all, an appeal is different from a trial. The proceedings occur mainly through written submissions, the briefs, and those briefs have to comply with specific court rules and if you represent yourself, you will be expected to comply with those rules and your appeal could be dismissed if you do not comply. Do you understand? Yes, I understand. On appeal, you must obtain and review the transcript of the trial proceedings and identify the potential legal errors committed at trial. The issues on appeal are limited to addressing what occurred at trial. The Court of Appeals reviews only what's on the record and will not consider new evidence for the first time. So, for example, in your case, if there was a matter that occurred overseas that you wanted to get it introduced but it wasn't introduced, you can't rely on that evidence. You can rely on the fact that you were deprived of the ability to produce it but that evidence is not in the record so the court can't consider it. Identifying appropriate issues requires legal knowledge and sophisticated analytic ability. If you fail to identify a legal issue, you may be barred from raising that issue again. Do you understand all that? Yes, I do, Mr. Commissioner. You are also required to support any assertion of error with legal authority. This means you must be able to research and understand the provisions of the Constitution, federal statutes and rules, and the cases from the Ninth Circuit and other courts that have discussed the area of the law. This task requires familiarity with legal research techniques. Do you understand? Yes, I do, Mr. Commissioner. There are also strategic determinations that come into play in any appeal. And this is particularly true here where there are a large number of issues that you have identified, some of which have some arguable merit, others are weaker, and it takes judgment and experience to know how many issues you should raise. If you raise too many, you undermine the strength of your stronger arguments. And it's especially true because you are limited to 14,000 words in your principal brief. So you have to use those words carefully and thoughtfully with the strategy of focusing on the most important issues. It's often difficult just to understand the analytic components of the issues on appeal, but even if you master that task, it's extremely difficult to convey that understanding persuasively in writing to judges who have limited time to read and study the briefs. The lawyers who are qualified to serve on our panels and those of lawyers who are appointed to represent criminal appellants spend years developing and perfecting those skills and going to trainings and continuing education. But if you represent yourself, you will have to accomplish the same thing without that training and experience. Do you understand that? Yes, I understand that. There are also additional difficulties you may encounter in representing yourself on appeal. Your access to legal materials may not be as extensive and free as a lawyer would have. You may or may not have some assistance in the facility where you reside. And if you have inmate assistance, there's no guarantee that that would continue. Finally, it will be more difficult for you to communicate with the court by telephone than it would be for a lawyer, and there are a number of obstacles that you would face that a lawyer wouldn't. Do you understand that? Yes, I understand that. In addition to the written submissions, the court allows oral argument, typically of 10 to 20 minutes in duration per side in some cases. That's an opportunity for the parties to ensure that the judges understand the arguments. It's also an opportunity for the judges to ask specific questions about the proper disposition of the appeal. Where a criminal defendant is represented by counsel, the court often schedules oral argument, especially in a case with as many issues and as significant as yours. But where a criminal defendant represents himself or herself, the court almost never allows oral argument, which means that the court would rely solely on the written submissions, and the court would likely not go through the oral argument process with an incarcerated prisoner. It's not unprecedented that that would happen, that there would be a pro se litigant who would be allowed to appear by telephone, but it's extremely rare. So by representing yourself, you severely diminish the possibility that the court will schedule oral argument. If you are represented by counsel, counsel will prepare a brief, and then you will not be allowed to prepare a brief unless counsel files what's called an Anders brief saying that there's no merit to this case, that I can see. In that event, but only in that event, would you be allowed to file a supplemental brief. All right, let me ask government counsel whether there's anything else that you wish to add about informing Mr. Boyajian of the dangers and disadvantages of self-representation on appeal. No, nothing on that point, thank you. All right. So I guess my main concern here, Mr. Boyajian, I have two main concerns about your request. The first concern is the point I just made. I think there's a good likelihood that the court is going to be interested in oral argument in this case, and it's going to be an obstacle for them to schedule it if you're incarcerated.  But the more important concern I have is the question of limiting the scope of this appeal to a manageable number of issues and claims. So in a case called Jones v. Barnes, the Supreme Court, in talking about the role of the counsel and the client in appellate representation, said it's the role of the appellate advocate to select the most promising issues for review. Not all issues, the most promising issues, winnowing out the weaker arguments. Now, you've identified about 20 issues here. You have 14,000 words. For you to develop the case and make a persuasive argument, you can't raise 20 issues. It doesn't work that way. You need to figure out a strategy, and that's what the main benefit is of having a seasoned appellate advocate. They can go through, they can figure out, they can prioritize the issues, they can determine, well, if you don't win on this issue, which is your strongest issue, you're not going to win on issue eight, which is a very, you know, a weaker issue, and it's not really, it doesn't go to the heart of what you're talking about. So that counsel will kind of be able to take an objective look at your case and figure out, well, here's the three things that Boyagi can say where he's got, he's got a shot at making, you know, making a point to the court that may yield a successful outcome. A, B, C. Mr. Commissioner, I think I identified potential issues, and as I research and look into them, some of them are going to be weaker and discarded, and I'm going to end up focusing on the main issues. This was just before we began the research for the appeal. So I think one of the questions that the court had asked me to brief was about my, you know, issues that I plan to raise. And so before having done my homework and really researching the points, I wrote down all the ideas that came to my mind, and, you know, so it's all rough. It was not meant to be that these are all issues that are being raised, but these are all issues that would be looked at and I would do research on, and I would pare it down to the point where, you know, the most important. And so it would be down to several issues at the time of the briefing, not a larger number than that. It wouldn't be 20 issues that I would actually be raising at the Indianapolis brief. It would be some subset of that, much smaller. All right. Let me ask the government whether you have any position or any comments to make at this stage concerning Mr. Boyer's request for self-representation. This is Amy David-Essinger-Jones. The government raised a general position in its filing that did raise a number of concerns in our response, and nothing that's been said during this hearing has assuaged those concerns. And, in fact, I think there have been a number of defendants reciting of the facts. There have been a number of factual inaccuracies just during this hearing. That sort of goes back to some of the concerns that the government raised in response. All right. And then that's all that we have at this point. All right. Thank you. Mr. Commissioner? Yes. If the government raised concerns, I was not privy to that. And it appears that they have read my response from the court, which is docket number 10, and also the appellant issues. But I never received any briefing or position or concerns from the government at all. Well, the government filed a document, Docket Entry 20, the government's response to defendants' requests for self-representation. I've never seen that. There's a proof of service on Ronald Boyajian at USP Tucson, P.O. Box 24550, Tucson, Arizona, 85734, that was served on February 27th. I have never received the government's docket. I have docket 19, which is the docket I received, which was before Mr. Appellant Commissioner Shaw, the court has received. That was the very last mailing I received. I have not received the government's docket 20. Do you have access to the court's docket through any computer access at the prison? Well, I think the issue is that I've received all the dockets before that. I received docket 19, docket 18. If the government is saying that they served me, and they put in the service stage, it would seem that they would have mailed it or made it accessible to me one way or the other. If the government knows I'm incarcerated, and that it would be me. I ask a different question. Do you have access to the docket through the computer system, through the electronic filing system at the prison, so that you could look at it? Could you locate, could you find this through your prison computer system? I have access to a computer here. You do not have access? I do not have access to a computer system that has any kind of pagers or any kind of legal documents in it. No. These things have always been mailed to me from the higher court, and I've received them. All right. Can I ask the government to reserve that document, please? Government counsel on the line still? Yes, yes, yes, Commissioner. We can re-mail it to defendants. We did mail it first class to defendants, and this issue of filings that were mailed to defendants, reportedly never getting there was an issue that came up frequently in front of the district court, and the government's position was that frequently those were delayed practice. So we will reserve it on a defendant, of course. Okay. Sorry, this is Alana Iverson speaking. Yes. Mr. Commissioner. Hold on, hold on. Is the government done? You asked whether there were any other parts of the advisement that might be important. Yes. And in light of this discussion, I would note that one of the disadvantages of self-representation is the inability to access the length of time that it might take for documents to reach the defendant, and this is another aspect that the defendant needs to be aware of in terms of something that he would be giving up by proceeding from say and not having the assistance of counsel in many of these logistical types of concerns. Okay, thank you. Did you hear that, Mr. Boyajian? Mr. Commissioner, may I explain something here? Yeah, I'd like an answer. Did you hear what Ms. Artson just said about delay in receiving materials? Yes. All right, okay. I heard that, yes. I'd like to respond that, first of all, I've been receiving all the documents. I've received one through 19. I have right here the letter that you sent on February 24th, and I received it this past Thursday. And this is the only docket that I didn't receive was the government's filing, only one. And I can, since during the trial, many of my filings were going through PACERS, the Dempsey law firm was permitting me to electronically file during the trial time. And if necessary, I can ask if he would also, their law firm, only for filing purposes, not for any other purposes, would make sure I get those dockets such as this. But the date of this is February 24th was filed docket 19. And so I don't know what date the government filed their docket, but it would have to be after February 24th, and that would have been, you know, if I was to try to find out if there was an additional filing, I could have done that if I had more time. But I think that the government trying to create a tactic here to make this an adversarial proceeding, I've never had problems getting dockets from the government or from anybody else. And what they did at trial was, in fact, they brought some to me during trial in person, and before that they mailed them or had them brought over to the NBC. The few times I didn't get a docket, the few times I had raised the issue and we solved the problem. But this is the only time it's happened, a single document from the government. I've got all the other 19. So you'll get this one as well. You'll get this one as well. I'd like to be able to breathe. In response to their opposition, I'd like to breathe and that we could continue at that point, because I think this puts me at a severe disadvantage for the government to have made this adversarial. They've objected, basically, here on the video conference to the ongoing pro se. I don't think that's fair. I didn't have to notice of their objections. I didn't even know that they were going to be breathing, in fact, or that this was anything but ex parte, to even expect their breathing. But I'd like to be happy to read it and to brief a response to that, because I think that they've misled Mr. Commissioner here in what they've said. And I do intend and I would like to go pro se, so this is very important. Okay. I'll grant you two weeks to submit a further pleading in response to the governments. And then after that, I will issue a report and recommendation to a panel of judges. I'll serve that on you. You'll have an opportunity to file objections, if you so choose. And ultimately, the panel will consider my report and recommendation, any objections that you submit, and they'll decide whether to grant your request or deny your request or schedule further proceedings. You understand that? Yes, I do. May I have four weeks to respond to their pleading? No, I don't want to give that much. I want this case to get moving. I don't want to delay the proceedings here. There's nothing that's, frankly, there's not a whole lot to respond to in the governments. The government states that it takes no position on the question of self-representation. They make a few additional points that you can, in five pages or less, address. But I, just so that you know, that there's nothing in the government's response to your request that is dispositive, as far as I'm concerned, about how I would rule on your request. Okay, and Mr. Commissioner, on the issue of oral argument, and I think, you know, I understand the disadvantage of that. And if, you know, we don't know what's going to happen in the PEPI ruling, but if that goes against me so that that no longer, let's say, is an issue for me, I don't know if the other issues are really those that would get to an oral argument. I think they're more black and white, some of them. But I do understand the dangers, and I am voluntarily waiting that I could have oral arguments and that disadvantage for the advantage of being able to ensure that my important issues are brief. And all the knowledge that I have being on this case for so many years. All right, let me ask government counsel on this question of the PEPI case. Does the government believe that the outcome in PEPI will be largely dispositive of some important issues in this case? Your Honor, I think it's impossible to predict what Mr. Boyajian is going to raise, and therefore it's impossible to predict whether PEPI would be dispositive. And I think the issue and the emphasis may be somewhat different, and certainly the facts relating to these events are very different. So it is factually different. I certainly don't think that it can be said at this point whether or not PEPI, or what effect the position of PEPI would have here. First of all, we don't even know that there will be a public position. So... Right. I don't think that even by his... I don't think that any prediction should be made at this point. And was that argued last month? It was argued last month. Before we leave, what's the status of transcript production? Have all the transcripts been prepared? The government has transcripts, and the defense should as well now. Almost all of the trial proceedings, the defense did order a number of pre-trial hearing transcripts, but I'm not... I can't tell you how many we have of those, but all the trial transcripts are prepared. And Mr. Boyajian, do you have copies of trial transcripts? I have it daily, every day, and right here at USP, I don't. I'll have to, you know, I'll have to go over that and make sure they're all intact and get them designated to the appellate court. That would be the first step that I would engage on were I to be designated as pro se, is to go out and make sure all the transcripts have been published and available and then designate them to the appellate court. To the trial court. I got you off. I got you off. Shoot. Did we just lose our... I bet we did. No, it's 2.40. Is that the time we are... Well, they were giving us an extra 30 minutes. They gave us an extra 15. Okay. Hello, can you still hear me on the telephone? Is he on, Mr. Boyajian? No. No, he's not. No. Okay. USA is on. Yeah, so... This is the commission. I'm talking only to counsel for the government. Now we've lost our connection via the video with Mr. Boyajian, so... I guess I will... I think we have covered all the important business. Is there anything else that the government has to offer at this time? No, Mr. Bishop. Okay. All right, so... I'm going to see if I can make contact with Mr. Boyajian again just to make sure that we complete the hearing. Do you have a phone number? At this stage, just a phone connection with the person would be fine. The only... Do you have this legal counsel? Yeah, the mobile... IT contact? You want to call the IT? This is... That was rolling on a real phone. Voicemail. I think this legal counsel, she was on before. Okay. Teresa. 520. 663. 520. 663. 663. 5025. It's because he has to be back at the prison by the cells at 4. So he has 15 minutes. He's in another building. Okay, he's not available. We got to cut off, so... It might be that he had to go back to his cell at this time. Okay. I just tried to call Teresa. I was just about to finish up but we haven't quite finished yet. I'll have a look and see what we can do. This is the government. Would it be possible to conclude the conference by phone? Yes, I'm hoping that we'll be able to complete it in any way possible. Okay, thank you. He has to be back by 4. It's a mandatory count. Yeah, I know. They didn't give us any warning. Yeah. Yeah, they hung up the call. Okay. All right. All right. Okay. So let's do an order saying that the hearing was... Okay. We're going to complete this matter. I'll conclude this matter right now. So I'm going to excuse counsel for the government with thanks for your participation. Thank you. Okay. Goodbye. Goodbye. Okay, so let's do an order right now saying that...
judges: Appellate Commissioner Shaw